## HOGGE v. SALT LAKE & O. RY. CO. et al.

No. 2710.    Decided August 24, 1915.    On Application for Rehearing Nov. 30, 1915.    (153 Pac. 585.)

1. ELECTRICITY—PERSONAL INJURIES—ACTION—INSTRUCTIONS. In an administratrix's action for death of one killed by an electric shock received while working on the roof of an electric railroad's power substation, a charge that if the railroad knew that it might be necessary for decedent to go upon the roof in doing certain work, and decedent did not know of the danger of coming in close proximity to high-tension wires, if the railroad maintained such wires uninsulated and did not warn deceased of the danger, and he, in the prosecution of his work, received a shock from such wires from which he died, verdict should be for plaintiff, the burden being upon her to prove her case by a preponderance of the evidence, unless the jury should otherwise find that decedent knew or should have known of the danger, or was guilty of contributory negligence, was not improper as rendering the railroad absolute insurer of any workman engaged upon the roof, when considered with charges that the road was not such an insurer, the duty of ordinary care devolving upon the workman, that if decedent knew of the danger and carelessly approached or touched the wires plaintiff was not

entitled to recover, and that if decedent failed to exercise the care of an ordinarily prudent man, under the circumstances, plaintiff could not recover. (Page 277.)

2. ELECTRICITY—INJURIES FROM NEGLIGENCE—DUTY TO WARN. Where a railroad company operating a power substation agreed with a light company that the latter should erect a contiguous substation, so that the same crew of employees might operate both, and also that the light company might use one of the railroad's substation's walls for the wall of the new substation, thus licensing the light company's contractors to go upon its premises to remodel the wall, the railroad was under a nondelegable duty to warn the light company's contractors for the necessary work of remodeling the wall, and their employees, of the danger of coming in contact with, or in close proximity to, high-tension uninsulated electric wires on the roof of the road's substation in the immediate vicinity where work would have to be carried on, since parties maintaining electric wires carrying high-tension uninsulated currents of electricity must exercise the necessary care and prudence to prevent injury to others who have the right to be on the premises where the wires are maintained, and who are liable to come in contact with the current.[1] (Page 279.)

3. ELECTRICITY—INJURIES—NOTICE OF DANGER—SUFFICIENCY OF EVIDENCE. In an action for death caused by decedent's coming in close proximity to high-tension wires, receiving a shock, evidence *held* sufficient to justify finding that before the accident defendant railroad knew or should have known that it might become necessary for decedent, in performance of work for another the road had licensed, to work near the wires. (Page 281.)

4. ELECTRICITY—INJURIES — CONTRIBUTORY NEGLIGENCE — QUESTION FOR JURY. In an action for death of a workman caused by electric shock from high-tension wires on the roof of defendant railroad's power substation, issue of contributory negligence *held* for the jury under the evidence. (Page 282.)

On Application for Rehearing.

5. ELECTRICITY—INJURIES—CONTRIBUTORY NEGLIGENCE—EVIDENCE—KNOWLEDGE OF DANGER. In an action for death by electric shock, where defendant railroad attempted to prove that decedent was killed while fiddling with a high-tension wire, and so was guilty of contributory negligence, the plaintiff attempting to disprove the defense by showing that decedent was familiar with the effects of an electric shock from the fact that he had lived in a house for some time with one crippled by a shock, the court's

---

[1] *Swan* v. *Salt Lake & O. Ry. Co.*, 41 Utah, 518, 127 Pac. 267.

refusal, after allowing such fact to be brought out, to permit the witness to answer whether decedent had not met the cripple at the table several times a day, was proper, as the evidence was wholly immaterial in view of the testimony already given. (Page 291.)

6. TRIAL—REMARK OF COURT—PROPRIETY. In action for death caused by an electric shock, where the defense was that decedent had been killed while fiddling about a high-tension wire, and so was guilty of contributory negligence, the plaintiff attempting to disprove the defense by showing that decedent had lived for some time in a house with a person who had been crippled by shock, the remark of the court, in excluding an immaterial question as to whether decedent had met such cripple at the table several times a day, that the court did not think the evidence showed much, was not erroneous, because it was true. (Page 291.)

7. TRIAL—CONDUCT OF COUNSEL—CONTEMPTUOUS REMARK OF COUNSEL. The statement of counsel, in an altercation over the exclusion of evidence, that the court was "wishwashy," was improper and contemptuous. (Page 291.)

STRAUP, C. J., dissents.

Appeal from District Court, Second District; *Hon. N. J. Harris*, Judge.

Action by Orenne Hogge, Administratrix, against the Salt Lake & Ogden Railway Company and others.

Judgment for plaintiff for $5,000. Defendant named appeals.

AFFIRMED.

*Boyd, DeVine & Eccles,* for appellant.

*C. R. Hollingsworth* and *H. H. Henderson,* for respondent.

## RESPONDENT'S POINTS.

The land owner is responsible to invitees upon the premises who suffer injuries from a nuisance created or a hidden and concealed danger maintained on his premises, when that result was reasonably to be apprehended from the usual and

ordinary method of doing the work contracted for. (*Thomas v. Harrington*, 54 Atl. 285, 65 L. R. A. 742.) The thing causing the death of decedent was not the result of any act or omission on the part of the contractor, or his sub-contractor, but the negligence of appellant. The evidence is clear that the contractor and the sub-contractor failed in no duty enjoined upon them to warn the deceased of the likelihood of danger. Jackson & Levedahl even were not warned by appellant of the existing hidden or concealed danger. They were in total ignorance that high tension wires like those in question gave off a brush, or disruptive or static discharge of electricity. The danger from this source, though present, was hidden. concealed and beyond the knowledge of the sub-contractors or their servants. The duty of making it known was upon the owner and proprietor—the appellant. (*Coughtry* v. *Woolen Co.*, 56 N. Y. 124, 15 Am. Rep. 387; *John Spry Lumber Co.* v. *Duggan*, 182 Ill. 218, 54 N. E. 1002; *Johnson* v. *Spear*, 42 N. W. 1092, 15 Am. St. Rep. 298; *Brannock* v. *Elmore*, 114 Mo. 55, 121 S. W. 451; Beach on Contributory Negligence, 51; *Stevens* v. *United Gas & Elec. Co.*, 60 Atl. 848, 70 L. R. A. 119; *Braun* v. *Buffalo Gen. Elec. Co.*, 94 N. E. 206, 21 Ann. Cases 370, 34 L. R. A. N. S. 1089, 118 N. Y. Supp. 1096; *Hoppe* v. *Winona*, 129 N. W. 577, 113 Minn. 252, 22 Ann. Cases 247; *Dunn* v. *Cavanaugh*, 185 Fed. 451; *Giraudi* v. *Electric Imp. Co.*, 40 Pac. 108; *Shank* v. *Great Shoshone & Twin Falls Water Co.*, 205 Fed. 833; *Fitzgerald* v. *Edison Elec. Mfg. Co.*, 50 Atl. 161, 86 Am. St. Rep. 732; *Smith* v. *Twin Cities R. T. Co.*, 112 N. W. 1001; *Overall* v. *Louisville Elec. Lt. Co.*, 47 S. W. 443; *Gagnon* v. *St. Maries Light & Power Co.*, 141 Pac. 88; *Byerly* v. *Con. L. P. & I. Co.*, 109 S. W. 1065; *Dow* v. *Sunset T. & T. Co.*, 121 Pac. 379; *Gentzkow* v. *Portland Railway Co.*, 102 Pac. 614.) This court has recently passed upon some of the matters involved in the present case. (*Speight* v. *Telephone Co.*, 107 Pac. 746; *Swan* v. *Salt Lake & Ogden Railway*, 41 Utah 518, 127 Pac. 267.) "The fundamental and general principle that a company like respondent, if reasonably chargeable with knowledge, or in the exercise of reasonable prudence bound

to anticipate, that people may lawfully come in close proximity to its wires either for purposes of business or pleasure, is under obligation to exercise care to keep the latter in a safe condition, is abundantly established." Citing: *Connell* v. *Keokuk Electric R., etc., Co.*, 109 N. W. 177; *Fitzgerald* v. *Edison Electric Illuminating Co.*, 50 Atl. 161, 86 Am. St. Rep. 732; *McLaughlin* v. *Louisville Electric Light Co.*, 37 S. W. 851, 34 L. R. A. 812; *Baries* v. *Louisville Electric Light Co.*, 80 S. W. 814, 85 S. W. 1186.

"Contributory negligence will not in all cases, however, be imputed, as a matter of law, to a person who receives an injury from a danger simply from the fact that it might have been seen, because the nature of his duties, or the surrounding circumstances, may be such as to distract his attention to the other objects. 1 Thomp. Neg. Sec. 189; *Webb* v. *Heintz*, 97 Pac. 753. And, under such circumstances, the question is for the jury, and not for the court. Illingsworth vs. Boston Electric Light Co., 161 Mass. 583, 37 N. E. 778, 25 L. R. A. 552; Mahan vs. Newton & Boston Street Railway Co., 189 Mass. 1, 75 N. E. 59; Reagon vs. Boston Electric Light Co., 167 Mass. 406, 455 N. E. 743; Commonwealth Electric Co. vs. Rose, 214 Ill. 545, 73 N. E. 780; Knowlton vs. Light Co., 117 Iowa 451, 90 N. W. 818; Paine vs. Electric Illuminating, etc., Co., 64 App. Div. 477, 72 N. Y. Supp. 279; Stevens vs. Company, 73 N. H. 159, 60 Atl. 848, 70 L. R. A. 119."

It has often been said that where the injured person is dead, wider latitude should be allowed to the jury in passing on the question of contributory negligence. (*Schafer* v. *New York*, 48 N. E. 749; *Noble* v. *N. Y. Central*, 46 N. Y. Supp. 645, 55 N. E. 1098.)

## STATEMENT OF FACTS.

Plaintiff, as administratrix of the estate of Lawrence Hogge, deceased, brought this action to recover damages for the death of Mr. Hogge, which occurred on the 28th day of June, 1911, at Ogden City, Utah. The defendants were the Salt Lake & Ogden Railway Company, a corporation, hereinafter referred to as "railway company," the Merchants'

Light & Power Company, a corporation, hereinafter called "light company," C. J. Humphris, and J. W. Levedahl and Lorenzo Jackson, copartners, as Levedahl & Jackson.

The facts of the case are about as follows: The railway company was, at the time of the accident which caused the death of Hogge, and for some time prior thereto had been, maintaining and operating an electrical interurban line of railroad from Salt Lake City to Ogden City. For the purpose of furnishing power to the electric line of road the company maintained an electric power house or substation in Ogden City. The substation building was constructed of cement and brick and was approximately forty-five feet square, and it was about eighteen or twenty feet from the floor to the roof, with fire walls on all four sides. These fire walls extended about four feet above the roof. The main line of the railway company's electric interurban system passes on the east of the substation and about thirty feet distant therefrom. Along this line of railway there is a pole line supporting transmission wires which continually carry a high current of electricity of approximately 44,000 volts used in propelling the railway cars. The wires of this transmission line leave a pole to the east of the substation building and then continue westward to and over the roof of the building. The line consists of three No. 4 uninsulated copper wires, parallel with each other, about six feet apart, and about nine feet above the roof. On the roof, and about fifteen feet west from the east wall of the building, there is a rack built into the roof. On this rack, which extends upwards, are three insulators in a north and south line, and one wire is supported by each insulator. There is another rack with a set of horn gaps near the west edge of the roof. The transmission wires extend first from the pole situated east of the building to the rack first mentioned, and thence to the rack and horn gaps near the west edge of the building. About midway between the racks mentioned, at approximately the center of the roof, three uninsulated wires, called taps, of the same size and character as the transmission wires, project downward seven or eight feet to the roof of the building. The center tap

projects straight downward, while the north and south taps
are drawn in so that the distance between the wires where
they pass through the roof into the substation building is
about three feet instead of six, as are the wires passing over
the substation roof. Three earthenware insulators, from two
to two and a half feet high, and about a foot in diameter,
are inserted in the roof, and the taps pass down through the
centers of these insulators. To the north of, and about six
feet from, the railway company's substation, was an alley-
way. The light company, which was an electrical distribut-
ing company located in Ogden City, had, some time prior to
the accident complained of, purchased the land adjoining the
alleyway on the north, and had obtained the right to close the
alleyway, and had leased from the railway company the six
feet of ground north of, and contiguous to, the railway com-
pany's substation building for a period of twenty-five years
for the purpose of erecting thereon, and adjoining the rail-
way company's substation building, a power plant or sub-
station. Under the terms of the agreement, which is styled
a "lease," the north wall of the railway company's substa-
tion building was to become the south wall of the light com-
pany's substation building. The agreement, or lease, con-
tained, among others, the following provisions:

"Whereas, it is mutually agreed and understood, by and
between the railway company and the light company, that it
will be mutually advantageous to operate both of said sub-
station buildings with one set of operators; and, whereas, in
order to do so it becomes necessary that the light company
build its substation building immediately adjoining the north
wall of the railway company's substation building, and that
a portion of said north wall of the railway company's sub-
station building be removed in order to make an opening
of sufficient size to give an unobstructed view from one sub-
station building into the room of the other substation
building.

" * * * The railway company does, * * * by
these presents, lease unto the light company the right to use
the north wall of the present aforesaid building of the rail-

way company as the south wall of the contemplated substation building of the light company, together with all of the land belonging to the said railway company, being that portion of the north end of lots  *  *  *  lying immediately north of the north wall of the railway company's substation building; together with the railway company's interest in and to the alley hereinbefore mentioned, lying immediately north of the railway company's substation building.

" * * * And the light company * * * agrees, to and with the railway company, that it, the said light company, shall pay an annual rental of thirty ($30.00) dollars, as full compensation to said railway company, for the aforesaid leased premises.

"The light company further expressly covenants and agrees with the railway company, that all of the costs of remodeling the north wall of the substation building of the railway company shall be borne by the light company.

" * * * The light company further expressly agrees, to and with the railway company, that in the remodeling of the north wall of the said company's substation building it will hold the railway company harmless from any and all damages that might result to the railway company's said substation building, and shall make whole said, if any, damage to the entire satisfaction of the railway company."

This agreement was executed August 8, 1911, about forty days after the accident in question occurred. The evidence, however, without conflict, shows that the two companies, the railway and light companies, had decided on remodeling the wall mentioned in the contract before work thereon was commenced. Simon Bamberger, who was president and general manager of the railway company during the year 1911 and also a stockholder of the light company, was called as a witness, and testified in part as follows:

"Q. Before the Merchants' Light & Power Company built this substation on the north end of yours, you talked it over with them about their putting the station next to yours? A. Yes, sir. * * * There was to be an opening cut into our wall. * * * Q. And you knew that was to be done, did

you not, before there was any work done? A. Yes, I knew
it was to be done."

The light company entered into a written contract with
C. J. Humphris for the erection of its substation building
and the removal of a portion of the wall mentioned. Humph-
ris sublet the brick and cement work to Levedahl & Jackson,
and they sublet the cement work to another contractor. This
cement work was completed before June 27, 1911. On that
day Levedahl, Jackson, and Roy Jackson, a son of defendant
Jackson, went to the railway company's substation building,
and by means of a ladder, which they placed against the
north wall near the northwest corner of the building, climbed
to the roof and commenced work, removing a tile coping
from the north fire wall. The material thus removed was
placed on the roof near the east fire wall. On the following
morning, June 28th, the defendant Jackson, together with his
son Roy and the deceased, Lawrence Hogge, with hammers
and crowbars, commenced taking down portions of the wall
from which the coping, the day before, had been removed.
The space occupied by them immediately south of the wall,
as the work progressed, was from five to eight feet. The
work of tearing down the wall continued until noon, when
the parties temporarily ceased work to eat their lunch. The
defendant Jackson, who had been working about fifteen feet
west from the center of the wall, went directly to and down
the ladder stationed near the northwest corner of the build-
ing. Hogge was working near the northeast corner of the
building, and Roy Jackson about midway between the north-
east and the northwest corners of the building. About the
time that defendant Jackson descended the ladder, Hogge
left the place where he had been working and immediately
thereafter came near enough to one of the high-tension wires
hereinbefore mentioned so that he received a shock and was
killed. His movements and what he said just prior to the
time he received the shock that caused his death, so far as
known, are related and described by the witnesses Roy Jack-
son and J. H. Emmett. Roy Jackson testified on this point
in part as follows:

"The buzzing on the wires seemed to be extraordinary heavy that morning, and he made the remark that they were insulated, and I said they were not."

He also testified that at the time of the accident he was four feet from the wall and about four feet from the place where he had been working; that Hogge went around him, and he thought Hogge "was going down"; that the next thing he "noticed was two big flames in the air, and Hogge stiffened and fell backwards"; that "the flames seemed to envelope his entire body"; that "it looked to me as if he were two feet from the insulator, * * * it seemed to me I could see between him and the wire." He further testified that the wire which gave Hogge the deadly shock "was ten or twelve feet, maybe twelve feet, south of us." Emmett testified that he was driving along the street a short distance from the place where these men were at work; that he saw them quit work; that he saw "Mr. Jackson go towards the west side of the building, and Mr. Hogge was about six feet from him"; that he saw him fall; that the flame left his feet first and his head last; and that he saw it "shoot back to the wire." He further testified:

"I ran around to the north of the building and hallooed for somebody to come. * * * At last somebody came out from the building, * * * and he says: 'For God's sake! Don't get within six feet of the wires or it will kill you.'"

The alleged negligent acts and omissions of defendants set forth in the complaint are that the defendants knew, or by the exercise of reasonable care and diligence should have known, that the transmission wires hereinbefore mentioned "were continuously carrying about 40,000 volts of electricity and were uninsulated and unguarded, * * * and by reason thereof were extremely dangerous to persons while working on said roof and while walking along said roof to and from their work, and rendered the place * * * dangerous and unsafe * * * in which to work"; that at said time it was well known to defendants, and each of them, said Lawrence was a young man, being only twenty years of age, and had no knowledge of electricity and had not been warned

against and had no knowledge of any dangers arising, or which might arise, from standing or passing in close proximity to said wires; that defendants and each of them permitted "said wires to remain in said dangerous position and condition uninsulated and unguarded, * * * and permitted said Lawrence Hogge to continue in said work and be on said roof where he was as aforesaid required to be and pass in close proximity to the said wires, and failed to notify or warn him of any of the dangers hereinbefore alleged, and failed to take any steps whatever to protect him from said dangers."

The defendant railway company filed its separate answer in which it denied the allegations of negligence contained in the complaint and denied that the deceased, Lawrence Hogge, had permission from it to work upon the roof of the substation building, or that he was there by its permission, and denied that it "owed him any duty either as employer or by reason of any knowledge as to his doings upon said day (June 28, 1911) as alleged in plaintiff's complaint or at all." It also pleaded contributory negligence on the part of Hogge.

During the progress of the trial, the action, on motion of the plaintiff, was dismissed as to all of the defendants except the railway company.

The cause was tried to a jury and resulted in a verdict in favor of plaintiff and against the railway company in the sum of $5,000. From the judgment entered upon the verdict, the railway company prosecutes this appeal.

McCARTY, J. (after stating the facts as above).

Counsel for appellant, with much earnestness, contend that it was never contemplated by either the railway company or the light company that the contractors or their employees, in the performance of the work in removing a portion of the north wall of the railway company's substation building, should or would go upon the roof of the building. The position of appellant in that regard is very clearly set forth by counsel in their printed brief as follows:

"Plaintiff's intestate was the servant of a mere trespasser, an independent contractor, and he, as well as his employees, as-

sumed the risks of whatever danger might be upon the premises and were compelled by law to take said premises as they found them at their risk.''

On the other hand, respondent contends that the deceased, Lawrence Hogge, was upon the premises—the roof of the substation building—as an invitee, and that appellant owed him the nondelegable duty of exercising ordinary care to keep the premises in a reasonably safe condition so that he would not be unnecessarily or unreasonably exposed to danger.

The court, among other things, charged the jury as follows (No. 9):

"If you find from all the evidence . * * * that the defendant Salt Lake & Ogden Railway Company knew, or in the exercise of reasonable care and diligence should have known, that it might become necessary for workmen to go upon the roof of said substation in the performance of said work, or that workmen would be apt to be called upon or go upon the roof of said substation in the performance of said work, and thereby come in such close proximity to the said high-tension wires that they would be apt to receive a dangerous current of electricity therefrom, and if you further find from all the evidence in this case that the deceased, Lawrence Hogge, was directed by said Jackson and Levedahl to go upon the said roof to do said work, and that the deceased, Lawrence Hogge, did not know of the dangers in coming in contact with or in close proximity to said high-tension wires located upon the roof of said substation, and if you should further find from all of the evidence that the defendant Salt Lake & Ogden Railway Company maintained said high-tension wires uninsulated and unguarded while said work was being performed, and gave no warning to said Lawrence Hogge of the dangers that might arise to said Lawrence Hogge by coming in contact with or in close proximity to the said high-tension wires, and that the said deceased in the prosecution of said work or while going to or from his said work, while not knowing that it was dangerous to come in contact with or close proximity to the said high-tension wires, came in contact with, or in close proximity to the said high-tension wires and thereby received

an electric shock from the said high-tension wires, from which he died, your verdict should be for the plaintiff. * * * The burden is upon the plaintiff, and it is for her to prove such facts by a preponderance of the evidence before she is entitled to recover, * * * unless you should further find that the said Lawrence Hogge knew, or by the exercise of ordinary care should have known, of the danger which might arise from coming in contact with or in close proximity to said high-tension wires, or unless you should further find that the said Lawrence Hogge was guilty of contributory negligence.''

This instruction is assigned as error. It is contended that the giving of it made the railway company ''the absolute insurer of any workmen'' engaged in remodeling the wall, who might be required to go upon the roof. The instruction should be read and considered in connection with the balance of the charge.

The court charged the jury as follows:

''You are instructed that the defendant railway company was not an insurer of the safety of said deceased, and that the duty of ordinary care devolves upon all persons, and at all times, and by such care is meant such care as an ordinarily prudent and careful man would exercise under like circumstances and conditions.

''You are instructed that if the deceased knew, or by the exercise of such reasonable care, as herein defined, should have known, that said wires were carrying such heavy current of electricity and were dangerous, and that notwithstanding such knowledge, and without any reason therefor, he carelessly or negligently approached and touched the same or went into close proximity thereto, and the injury resulted, then the plaintiff is not entitled to recover.

''You are therefore instructed that if the deceased failed to exercise such degree of care as an ordinarily prudent man would have exercised under like circumstances and conditions, and in doing the work required to be done, or failed to exercise such care in going to and from said work, then the said deceased was guilty of contributory negligence, and would not be entitled to recover in this action.''

We do not think that the instruction complained of when read and considered in connection with the foregoing portions of the charge, is susceptible of the construction contended for by counsel for appellant.

It is argued that as the deceased was working for, and under, an independent contractor, the railway company owed him no legal duty whatever to warn him of the danger of going upon the roof and in close proximity to the high-tension wires hereinbefore mentioned, and for that rea-          2
son the instruction complained of is misleading and er-roneous. We do not think there is any merit whatever to this contention. There can be question but what Levedahl & Jack-son were independent contractors, and that the railway com-pany exercised no supervision or control over their employees who were engaged in tearing down and removing a portion of the north wall of the substation building. The records shows, however, that the remodeling of the wall was for the mutual benefit of the two companies. In the preamble of the contract, portions of which are set forth in the foregoing statement of facts, it is recited that:

''Whereas, it is mutually agreed and understood by and be-tween the railway company and the light company, that it will be mutually advantageous to operate both of said substations with one set of operators; and, whereas, in order to do so it becomes necessary for the light company to build a substation building immediately adjoining the north wall of the railway company's substation building and that a portion of said north wall * * * be remodeled,'' etc.

It may be inferred—in fact, it is the only reasonable con-clusion that can be drawn from the evidence—that the con-tract contains the terms and conditions under which the work of remodeling the wall was commenced and carried on. Under the contractual relations thus created, the light company and its contractors and employees were authorized to go upon the premises of the railway company for the purpose of remodel-ing the wall, and, in so doing, they were not trespassers, as counsel for appellant seem to contend. True, the remodeling of the wall was to be done, and the expense thereof borne, by the light company. This, however, did not relieve the railway

company of its duty, which was nondelegable, to warn the contractors and their employees of the danger of coming in contact with, or in close proximity to, the high-tension wires that were in the immediate vicinity of the place where the work of remodeling the wall was to be carried on.

In 1 Thompson on Negligence, section 680, the author says:

"The relation of master and servant does not subsist between the proprietor and the servant of the contractor; and therefore those obligations which the law imposes upon the master for the protection of one injured while in his service do not rest upon the proprietor, but upon the contractor. On the other hand, the servant of the contractor must be deemed to be upon the premises of the proprietor by his invitation, express or implied; and therefore he owes him the same duty of guarding him against the consequences of hidden dangers on the premises that the proprietor would in any case owe to a guest, a customer, or other person coming by invitation upon his premises."

And again (section 979) :

"It is not necessary to suggest that, where a proprietor engages an independent contractor to do work upon his premises, the contractor, while executing the work, will be there in pursuance of the invitation of the proprietor and the proprietor will  *  *  *  be under the duty of exercising ordinary or reasonable care to the end of protecting his safety. In almost every such case there is the further implication that if a contractor brings third persons, his own employees, his partners or assistants to assist him in executing the contract, such persons are presumably upon the premises by the invitation of the owner and he owes to them the same measure of care to the end of promoting their safety that he owes to the contractor himself; and this although no contractual relation exists between the proprietor and them."

In Beach on Contributory Negligence, section 50, the rule is stated thus:

"When  *  *  *  the circumstances are such as to imply an invitation to go upon property, he who enters is no longer a trespasser, and the owner is bound to exercise ordinary care and prudence toward him. The invitation or license, express or implied, creates this duty." *Stevens* v. *United Gas & E. Co.*, 73 N. H. 159, 60 Atl. 848, 70 L. R. A. 119; *Spry Lumber Co.* v. *Duggan*, 182 Ill. 219, 54 N. E. 1002; *Gagnon* v. *St. Maries Light & Power Co.*, 26 Idaho, 87, 141 Pac. 88; 29 Cyc. 453.

It is contended that appellant had no notice that the con-

tractors and their employees would, in remodeling the wall, go upon the roof of the substation building, and hence was under no legal duty to place danger signs or signals on the roof, or to otherwise warn them of the danger of coming in contact with, or in close proximity to, the uninsulated high-tension transmission wires mentioned. The president of **3** the railway company, who was also a stockholder of the light company, testified that he "knew it (the work) was to be done." Furthermore, appellant was a party to the understanding or agreement under which the work of remodeling the wall was to be performed. Appellant therefore had notice that the work would be done. The evidence, what there is on the point, tends to show that the most practical and economical way of remodeling the wall was the one that was being followed at the time the accident occurred. The jury therefore were justified in finding that prior to the accident appellant "knew, or in the exercise of reasonable care and diligence should have known, that it might become necessary for workmen to go upon the roof of said substation in the performance of said work." This is one of the several propositions submitted to the jury by the instruction complained of.

It is settled law that parties who maintain electric wires carrying high and dangerous currents of electricity are bound to exercise the necessary care and prudence to prevent injury to others who may have the right to be on the premises where the wires are maintained and who are liable to come in contact with the hidden, silent, and deadly current with which the wires are charged. Joyce on Electric Law, section 445; *Perham* v. *Portland Gen. Elec. Co.*, 33 Or. 451, 53 Pac. 14, 24, 40 L. R. A. 799, 72 Am. St. Rep. 730; *Swan* v. *Salt Lake & O. Ry. Co.*, 41 Utah, 518, 127 Pac. 267. In 2 M. A. L. 418, the rule is clearly, concisely, and, as we think, correctly stated as follows:

"Electricity is another impalpable and dangerous force, and those who make, sell, or handle it are held to the use of the greatest care to avoid injuring those who must come and go where it is employed. Here again the rule is that care must be proportioned to the danger to be avoided."

Applying this well-established principle to the facts of this

case, we cannot hold as a matter of law, that appellant was not negligent.

Appellant requested the court to direct a verdict in its favor "no cause of action." The refusal of the court to so instruct the jury is assigned as error. The contention made in support of this assignment is that the deceased was, as a matter of law, guilty of contributory negligence. The deceased, at the time of the accident, was twenty years of age, and while it may be inferred from the evidence that he knew or had reason to believe that the wires mentioned were charged with electricity, and that he, in a general way, knew of the danger of coming in contact with wires carrying heavy currents of electricity, there is no evidence whatever tending to show that he knew, or should have known, that these particular wires were carrying heavy currents. Lorenzo Jackson, the subcontractor under whom the deceased was working, testified that, while he (Jackson) "thought they were carrying electricity," he "didn't know the voltage." As stated in *Fitzgerald* v. *Edison Elec. Ill. Co.*, 200 Pa. 540, 50 Atl. 161, 86 Am. St. Rep. 732:

"Wires charged with an electric current may be harmless, or they may be in the highest degree dangerous. The difference in this respect is not apparent to ordinary observation, and the public therefore, while presumed to know that danger may be present, are not bound to know its degree in any particular case."

Practically the same observation is made—the same thought expressed—in the case of *Mitchell* v. *Raleigh Elec. Co.*, 129 N. C. 166, 39 S. E. 801, 55 L. R. A. 398, 85 Am. St. Rep. 735, in the following words:

"Electricity * * * is the most deadly and dangerous power recognized as a necessary agency in developing our civilization and promoting our comfort and business affairs. It differs from all other dangerous utilities. Its association is with the most inoffensive and harmless piece of mechanism—if wire can be classified as such—in common use. In adhering to the wire, it gives no warning or knowledge of its deadly presence. Vision cannot detect it. It is without color, motion, or body. Latently, and without sound, it exists, and, being odorless, the only means of its discovery lies in the sense of feeling, communicated through the touch, which as soon as done, becomes its victim."

As hereinbefore stated, Roy Jackson, who was at work about midway between the northeast and northwest corner of the building, testified that when the deceased received the shock that caused his death he was about ten or twelve feet from where he (Jackson) was standing and about fifteen feet from the wall that was being remodeled; that it appeared to him that Hogge was "about two feet" from the insulator; that when Hogge received the shock he "stiffened and fell backwards." J. H. Emmett, who, at the time of the accident, was about 200 feet north from the substation building and saw what occurred from the street, testified that Hogge was "about three or four feet from the insulator when he received the shock"; that he immediately went to the scene of the accident and found Hogge lying on his back, his head towards the northeast corner of the building and his feet "about three feet from the insulator"; that he "got a stick and hooked it into his clothes and rolled" him away from the wire. Lorenzo Jackson, one of the contractors under and for whom Hoggs was working, testified that he returned to the roof of the building immediately after the accident occurred, and his testimony respecting the location of the deceased with reference to the high-tension wires from which he received the shock and the position he was in is the same as that given by Roy Jackson. There is a conflict in the evidence as to the extent of the danger zone of uninsulated wires carrying 40,000 volts of electricity. Respondent's evidence on this point tends to show that the danger zone extends about three feet from the wire. Appellant's evidence tends to show that it is from one to three inches only. There is, however, ample evidence to support a finding by the jury that the deceased was from two to three feet from the wire when he received the deadly current that caused his death. There is evidence to show, and the jury were authorized in finding, that the deceased was passing around or by Roy Jackson in the act of leaving the roof of the building, and that he was, as stated, from two to three feet from the wire when he received the shock. There is absolutely no evidence whatever tending to show that when he received the shock he was in close proximity to the wire "for recreation or for exploitation of

idle curiosity or for experimenting to see whether or not the wires were insulated," or was engaged in "meddling or foolhardy experiments," as contended by counsel for appellant. The evidence of Emmett, which is corroborated by the testimony of Roy Jackson, tends to show that the deceased was in the act of leaving the roof of the building, and that he was not, as claimed by appellant, "experimenting" with the wires.

We are clearly of the opinion that the court did not err in refusing to direct a verdict for appellant on the alleged ground that Hogge was, as a matter of law, guilty of conrtibutory negligence. The court very fully and very clearly instructed the jury on that issue. The assignment of error based thereon is therefore overruled.

Numerous other errors are assigned, but we do not think they, or any of them, contain sufficient merit to warrant discussion.

The judgment is affirmed.    Costs to respondent.

FRICK, J.

I concur.    I can perceive no substantial merit to the contention that the judgment should not prevail for the reason that the deceased was alleged to be the employee of all of the parties who were originally made defendants including the railway company, the appellant.    While some of the allegations of the complaint might bear that construction, yet, from the whole complaint, it is clear enough that what was in fact alleged and intended was that the deceased was, at the time of his death, engaged in doing work in which all of the defendants in some capacity were interested.    The relationship of each of them to the work was, however, fully set forth in the complaint.    The railway company was directly interested in having the work in question done.    Now, the work, if it was done, necessarily required the deceased, or whoever did it, to go near the dangerous instrumentality, the high-tension wires which were charged with a highly dangerous element.    All this the railway company knew, and it must have appreciated the danger to which the deceased, or any one else engaged in doing the work, would be exposed.    How can the railway company escape liability, therefore, by merely saying "the deceased was

not my servant, but he was the servant of another, and there-fore, I did not owe him a master's duty?" While the railway company may not have owed the deceased the duty a master owes to his servant, yet, in view of all the facts and circum-stances, it owed him the duty of not knowingly permitting him to go into a death trap while he was on its premises perform-ing his duties. It owed him that duty as a mere invitee; but, in view that it was directly interested in having the work done, I think it owed him the further duty of informing him of any hidden dangers and to protect him against unwillingly coming in contact with or going dangerously near any dan-gerous instrumentality which might be on the railway com-pany's premises. To my mind it is rather technical to now say that, in view that some of the allegations of the complaint may be construed to the effect that the deceased was directly employed by all of the parties originally made defendants, the railway company should be exonerated, notwithstanding the fact that the deceased's relationship to the work and his relationship to the railway company was clearly established at the trial to be such that the railway company owed him the duties I have pointed out, and notwithstanding the further fact that the case was tried by both parties and submitted to the jury upon the actual relationship of all the parties to the work and to the deceased. While no doubt some errors crept into the record during the course of the trial, yet, in my judg-ment, none of them would justify a reversal of the judgment under our statute. If a new trial were granted, I cannot per-ceive how the railway company can escape from the facts, and it certainly cannot escape from the law applicable thereto. All persons, who may require or even permit laborers of merely ordinary experience to go onto their premises to do some work or discharge some duty in which such persons are interested and there are highly dangerous instrumentalities kept on the premises where such work is to be done or duties performed, owe the duty either to make such instrumentalities as harm-less as practicable, or, if that cannot be done, to at least ap-prise such laborers of the dangerous condition of such instru-mentalities. It cannot be assumed that all persons know and appreciate the danger lurking in high-tension wires or in elec-

trical appliances charged with thousands of volts of electrical current. The law in this, as in many other respects, is both humane and practical, and places the responsibility upon those who control and therefore can, in a measure at least, make extremely dangerous instrumentalities reasonably safe and harmless. In failing to do that they are manifestly guilty of negligence and are liable unless they may escape liability for other reasons. As I view it, the pleadings, the instructions, and the verdict all squarely rest on the foregoing principles, and for that reason the judgment should prevail.

STRAUP, C. J.

I dissent. The complaint is predicated on the theory that all of the defendants, the appellant, the light company, and Levedahl & Jackson, "were engaged" in lowering and removing the wall; that the deceased was "in the service and employ" of all "of said defendants," and was by them engaged and directed to remove brick from the wall, and for that purpose, and in the course of his employment, to go upon the roof of the building where were the charged wires; that he, with "the knowledge, consent, and acquiescence of all of the defendants," went upon the roof and there engaged in such work; that the heavily charged wires on the roof were negligently suspended, uninsulated, unguarded, and unprotected; and that the deceased, who was without knowledge of the charged wires, was unwarned and not notified of the danger in going near, or coming in contact with them. The complaint is thus predicated on the theory that the deceased was in the service and in the employ of the appellant as well as the other defendants; that it was engaged in removing the wall; that it employed the deceased to remove brick from the wall; that it, for that purpose, directed the deceased to go upon the roof; and that he, with its knowledge, consent, and acquiescence, went upon the roof and there engaged in such work. I do not find anything to support these allegations.

It was thought advantageous for both the appellant and the light company to operate their substations with one set of operations. To accomplish that the appellant granted the light company the right to use and to remove a portion of the north

wall of its substation. That was agreed to be done wholly at the cost and expense of the light company. To remove the wall and to do other work about the premises the light company let a contract to Levedahl & Jackson. They employed the deceased. They, even as to the light company, were independent contractors. As between them and the appellant no relation whatever existed. The deceased was subject to the direction and control of Levedahl & Jackson alone, in whose employ he was. They owed him master's duties. No such duties were owing from the appellant to him. It was not engaged in doing the work, and in no manner had charge of, or control over, it, nor did it in any particular superintend or direct the work, nor did it reserve or exercise the right to direct or control it, either with respect to results, methods of procedure, or means by which the result was to be accomplished. Nor did it, in any manner whatever, have any control over, or direction of, the deceased. He was a total stranger to it. I do not see wherein the appellant owed him any master's duties, the alleged duties.

In a way, it is claimed that the appellant owed the deceased duties which a proprietor of premises owes an invitee. In the first place, I think that is wholly without the issues. To permit a recovery for breaches of a propreitor's duties on a complaint predicated on alleged breaches of master's duties is, it seems to me, a fatal departure. Such a variance permits recovery on a theory wholly different from that alleged, and hence is a material variance, and one which naturally leads the opposite party to his prejudice. For that reason was the charge No. 9 referred to in the prevailing opinion, erroneous. In the next place, I do not think the principle applicable to the evidence. The appellant, neither expressly nor impliedly, invited the deceased, or any one, on or about its premises. It did no work, nor did it let any to be done, on or about them. It but granted the light company the right to use and remove a portion of its wall. Levedahl & Jackson, in whose employ the deceased was, were not its contractors. They were the contractors of the light company and were total strangers to the appellant. I therefore think the judgment should be reversed, and the case remanded for a new trial.

## ON APPLICATION FOR REHEARING.

McCARTY, J.

Counsel for appellant have filed a petition for a rehearing, in which they assert that the prevailing opinion contains misstatements of facts and a misapplication of the law to the facts. The first assignment of error in that regard is directed to what is said in the prevailing opinion regarding Levedahl & Jackson being independent contractors. It is there said: "There can be no question but what Levedahl & Jackson were independent contractors." Counsel for appellant, in their brief and during the oral argument of the case before this court, contended, and they again reiterate in their petition for a rehearing, that Levedahl & Jackson were independent contractors. This was conceded by respondent. This assignment is therefore wholly without merit. Counsel have not made, nor have they attempted to make, any argument in support of this ground, which they classify as "subdivision 1 of our (their) specifications of error on this particular." They merely set forth in detail the evidence tending to prove what this court found and what both parties concede to be the fact.

Counsel, in support of what they claim to be the "second misstatements of fact made by the court and assigned as error," refer to the testimony of Emmett as set forth in the statement of facts preceding the opinion, and then proceed to quote from his testimony as follows:

"Two men appeared to be on the roof at the northeast corner of the substation building. I afterwards learned that the two men I saw in the position I have indicated were Mr. Jackson and Mr. Lawrence Hogge, the man who was killed. *I saw Mr. Jackson go towards the west side of the building, and Mr. Hogge was about six feet away from him,* when all at once Mr. Hogge bust into flames."

Counsel, after making the foregoing quotation, proceed as follows:

"Taking the court's version or account of the transaction, Hogge was *six feet from Jackson* when he burst into flames. With all due respect to the court we insist that Mr. Emmett *does not say so.*" (Italics ours.)

Counsel's assertion that our version of the transaction referred to by Emmett is that "Hogge was six feet from Jackson when he burst into flames" is not borne out or supported by anything said in the opinion. A casual reading of the opinion will show that this statement of counsel is no less rash than their position wherein they declare in one breath that Emmet testified to a certain fact, and in the next breath deny that he gave any such testimony. In stating the facts we say:

"Hogge was working near the northeast corner of the building, and Roy Jackson about midway between the northeast and northwest corners of the building. About the time that defendant Jackson descended the ladder, Hogge left the place where he had been working."

We venture no opinion whatever as to the exact or approximate distance between these two men when the accident occurred.

One defense interposed by appellant was that of contributory negligence. It was contended that Hogge was "fooling with the apparatus belonging to defendant railway company to see whether or not its lines were insulated; that he was actuated by mere idle curiosity and was simply an intermeddler," etc. Failing to find any evidence in the record to support this contention, we said:

"His (Hogge's) movements and what he said just prior to the time he received the shock that caused his death, so far as known, are related and described by the witnesses Roy Jackson and J. H. Emmett."

We there set forth the substance of Jackson's testimony on this point and the testimony of Emmett hereinbefore mentioned, not for the purpose of showing that the distance between Jackson and Hogge was six feet when the accident occurred, but for the purpose of showing that the jury were justified in finding against appellant on the question of contributory negligence. Considering the circumstances under which Emmett saw Hogge in connection with the testimony of Roy Jackson, it might be contended with much force that Emmett may have been, and probably was, mistaken as to the distance Hogge was from J. H. Jackson at the time the accident

occurred. We have not expressed, nor do we now venture, an opinion as to the exact or approximate distance these men were apart when Hogge came in contact with the fatal current that caused his death. Counsel, in their oral argument before this court contended, and in their brief they say, that:

"There was no proof that defendant railway company knew, or by the exercise of even extraordinary diligence could have known, that the employers of plaintiff's intestate, and plaintiff's intestate himself, were going to invade its premises at the time and in the manner testified to upon the day of the accident."

In answer to this contention, we said in the opinion that:

"The president of the railway company, who was also a director of the light company, 'knew it (the work) was to be done.' "

This is charged up as a third "misstatement of facts." It is pointed out that we were in error in stating that Mr. Bamberger was a director in the light company. The opinion should have read that he "was also a stockholder of the light company," and we have corrected the opinion so as to show the fact. The undisputed evidence shows that Mr. Bamberger was a stockholder of the light company and was present at a meeting of the directors of the company when a resolution containing substantially the same matter as is contained in the contract entered into between the two companies for the remodeling of the substation building was passed by the directors authorizing the execution of the contract on behalf of the company by the president and secretary. The resolution, which is in evidence, recites, among other things, that:

"Whereas, the Salt Lake & Ogden Railway Company, through its president, Honorable Simon Bamberger, has offered to lease  *  *  *  six feet of ground, together with its interests in the alley and the necessary support of the north wall of the present substation building  *  *  *  to the Merchants' Light & Power Company," etc.

It is therefore idle for counsel to contend that appellant had no notice that the contractors and their employees "were going to invade its premises" for the purpose of doing the work con-

templated by the lease or contract entered into between the two companies.

Counsel assert that:

"The court in the majority opinion finds as a fact that Hogge was a young  *  *  *  man inexperienced in matters pertaining to electricity and electric wires."

This is error.   What we said, as the opinion shows, was this:

"While it may be inferred from the evidence that he knew or had reason to believe that the wires mentioned were charged with electricity, and that he, in a general way, knew of the danger of coming in contact with wires carrying heavy currents of electricity, there is no evidence whatever tending to show that he knew, or should have known, that these particular wires were carrying heavy currents."

But why complain?   Counsel, in their brief on petition for a rehearing, refer to Hogge as a "young and inexperienced workman, unacquainted with the uses of electricity."

Counsel are somewhat prolific in their assertions that the trial court was biased and exhibited its bias during the progress of the trial to such an extent as to deprive their client of a fair and impartial trial.   This contention is based upon one ruling and a certain remark made by the court in connection with the ruling.   Counsel for appellant, in 5, 6, 7 order to show what knowledge, if any, Hogge possessed of the danger of coming in contact with wires charged with electricity, on cross-examination of the plaintiff Orenne Hogge, elicited the following testimony:

"My husband was a strong, able-bodied man.   His hearing and eyesight were good.   He was perfect in all of his physical faculties so far as I know.   His mental faculties good, absolutely all right.   He was possessed of the usual knowledge that a young man of 20 years would have.  *  *  *  I have a brother who was living at my father's home during the time Mr. Hogge and I lived there, and he had also come in contact with electric wires some two years before.   He resided there all the time we resided there.   He was crippled as a result of coming in contact with high-tension wires, and is still a cripple.   My husband knew he was a cripple, and I suppose he knew what caused it.   Everybody knew it, espe-

cially members of our own family. Q.. At any rate, Mr. Hogge knew this brother quite well, did he not? A. He knew him, yes. Q. Saw him every day? A. Saw him. He didn't see his burns, never. Q. But he saw him every day? A. He saw him after work at night; yes, sir. Q. And all lived in the same house? A. Yes, sir. Q.. Met, I take it, around the family table at least once or twice a day?'' Counsel for Plaintiff: ''Now I object to that. I can see no competency or relevancy in that cross-examination.'' The Court: ''You are not trying to show that he knew anything about the wires that he came in contact with?'' Counsel for Appellant: ''That is true, if the court please. * * *''. The Court: ''You are attempting to show that he was acquainted, saw some one who had been injured two years before?'' Counsel for Appellant: ''And knew the effects of coming in contact with electric wires.'' The Court: ''Objection may be over-ruled.'' Counsel for Plaintiff: ''Give me an exception. I don't care much about it.'' Counsel for Appellant: ''Then don't except.'' The Court: ''I don't think it shows much, but for what it does show—'' Counsel for Appellant: ''We shall except to the remarks of the court.'' The Court: ''Then I shall sustain your objection.'' Counsel for Appellant: ''Now, then, we ask the stenographer to take down all the court's different rulings and his present remarks. We take an exception to the ruling of the court.'' The Court: ''I take it that the stenographer understands his duties, gentlemen.'' Counsel for Appellant: ''I take it, your honor, we want to take our exception, and if the court wants to be wishwashy, back and forth from one side to the other—'' After some further remarks by the court and repeated exceptions noted by counsel, the court replied: ''You may proceed. The testimony will be excluded. You may take all the exceptions you want.''

Counsel, in their original brief, claim that the foregoing shows bias on the part of the court, and that the remarks of the court were prejudicial to the rights of appellant. In their reply brief counsel ''disclaim any intentional impertinence * * * or desire to reflect'' on the court, and they suggest that what was said was in the heat of the trial and ''ardor of argument,'' and say: ''If we have offended, we are very

sorry and tender an apology in absolute good faith." The court was right in sustaining the objection. In view of the testimony already given by the witness, to which there was no objection, the question of whether she and her husband "met around the table" of the elder Hogge "once or twice a day" was wholly immaterial. As the court remarked, it did not "amount to anything." It did not prove, or tend to prove, any issue in the case. And it is evident from the character of the testimony already given by the witness that the question was not asked for the purpose of testing the memory or veracity, or showing bias of the witness. Nor do we think the remark of the court was error. While the statement of counsel that the court was "wish-washy" was improper and contemptuous, yet, in view that counsel in their brief disclaimed any intentional disrespect for the court, we decided not to consider the assignment of error based on that part of the record under consideration, and thereby avoid perpetuating it in the opinion. Counsel's persistence in referring to and charging error because of the remarks and ruling of the court in that particular has impelled us to consider the assignment based thereon.

We are clearly of the opinion that the petition should be, and the same is, denied.

FRICK, J.

I concur. In view, however, that counsel in their argument on rehearing somewhat vigorously assail the correctness of my statements of the law in my concurring opinion, I desire to add a word to what is said by my Associate.

By comparing the arguments and statements in support of the petition for a rehearing with those contained in the original brief, it is manifest that the writer of that brief is not the author of the one filed on rehearing. In answer to the complaint that I cited no authorities in support of my statements of the law, it is sufficient to say that I did not deem it necessary to refer to authorities for the reasons: (1) Because I stated merely elementary principles which are, or should be, familiar to all lawyers; and (2) because in counsel's original brief these principles are all conceded. The only

difference between myself and counsel in that regard was that they insisted that those principles had no application to this case, while I thought, and still think, that they apply with full force. Counsel who writes the brief on rehearing, however, seems to have entirely overlooked the statements contained in the former brief. In case differences arise between counsel and the members of this court with regard to the law, we, and not counsel, must assume the responsibility of determining whether their or our views shall prevail.

Counsel now refer to plaintiff's complaint as a mere "dragnet" which they could not successfully meet. It is quite true that the complaint contains many allegations that perhaps would not have been necessary. The record, however, discloses that defendant's counsel interposed a number of demurrers, general and special, to the complaint as first filed and as thereafter amended, and that the court joined in their views of what the complaint should contain until plaintiff's counsel were compelled to multiply their allegations unnecessarily for the purpose of meeting the views of both court and counsel. This is another case therefore where counsel, by filing special demurrers, have demanded additional averments until the complaint was loaded with unnecessary allegations and now they complain of what they themselves, in a large measure at least, were responsible for bringing about. But the supposed imperfections of the complaint were not argued in the original brief, and the subject of pleading was there merely touched upon in passing. The defects in the complaint, as pointed out in my original concurring opinion, were, however, not such as would justify a reversal of the judgment. The appellant was fully apprised of all of respondent's claims, and it was given every opportunity to meet, and it attempted to meet, every claim contended for by respondent's counsel. In other words, the appellant was given every opportunity to present every defense it had, and the pleadings were sufficient to admit of all the evidence produced on both sides, and all the material issues were presented to the jury. Under such circumstances, our own statute (Comp. Laws 1907, section 3008) is sufficient answer to the objection that is now urged against the complaint. That section reads:

"The court must in every stage of an action disregard any error or defect in the pleadings or proceedings which does not affect the substantial rights of the parties, and no judgment shall be reversed or affected by reason of such error or defect."

Moreover, section 3285 of our Code provides:

"No exception shall be regarded unless the decision excepted to is material and prejudicial to the rights of the party excepting."

We thus must determine whether the matters objected to are material and prejudicial to the rights of the complaining party.

When we have given the matters before us our best judgment and efforts before arriving at a conclusion, we can do no more. Under such circumstances, it is useless to merely reargue, in an application for a rehearing, the questions already decided. Neither does it aid the court, although it may temporarily relieve counsel, to become facetious. While counsel very properly may draw upon all the sources of information, including literature, to illustrate their arguments, yet in doing so some care should be exercised that their zeal does not betray them into assuming a false or unreasonable position, as is manifest has been done in the petition for rehearing before us. Counsel who prepared the petition somewhat feelingly suggests that in my concurring opinion I have proffered him consolation somewhat similar to that proffered to Elder Sniffles by the widow Bedot. Let me assure counsel, if such assurance is necessary, that what I said was not intended as a solace for his lacerated feelings. His zeal betrayed him into assuming such a position. I have long since learned that it is as impossible to console as is it to convince losing counsel. What I said was not by way of consolation, but was given as an added reason why the judgment should prevail. After reading counsel's petition for a rehearing, I can see no good reason for changing my opinion.

STRAUP, C. J., dissents.